MCB Management Services, L.L.C., et al

Plaintiffs/Counterclaim Defendants

vs.

Washington Regional Cardiac Surgery, P.C.

Defendant/Counterclaim Plaintiff

Case No.: AMD 02 CV 525

Expert Witness Report of Raymond J. Peroutka, Jr.

Dated September 26, 2002

**MCB Management Services, L.L.C., et al**

Plaintiffs/Counterclaim Defendants

vs.

**Washington Regional Cardiac Surgery, P.C.**

Defendant/Counterclaim Plaintiff

**Case No.: AMD 02 CV 525**

### Expert Witness Report of Raymond J. Peroutka, Jr.

I.  **UNDERSTANDING OF THE CONTROVERSY**

I have reviewed the Complaint filed by MCB Management Services, LLC ("MCB") and Physician Support Services, LLC ("PSS") on February 19, 2002 (the "Complaint"). I have also reviewed MCB's Answer to Complaint and Counterclaims (the "Counterclaim"), MCB Management Services, LLC's Answers to Defendant's First Set of Interrogatories, as well as the Depositions of Charles A. Zorn III, Kathy Sanzone, Hildegard B. Counts, and Richard A. Barsky, CPA, along with all related deposition exhibits. Based on my review of these documents, my understanding of the controversy is as follows:

MCB was originally formed to separate the management services provided to the cardiac surgical office of Drs. Mispireta and Corso from the entity operating the practice itself- GMCP. Prior to November 1, 1999, MCB was owned by William R. Beam (25%), Dr. Louis A. Mispireta (37.5%) and Dr. Paul J. Corso (37.5%). Prior to November 1, 1999, MCB was also an 81% owner of PSS, which provided billing, collecting and accounting for MCB's clients and others. Whelan, Barsky, and Graham, the medical practices and MCB's accountants owned the remaining 19% of PSS, which was funded by a $500,000 line of credit personally guaranteed by Drs. Mispireta and Corso. The initial consulting Agreement executed on or about January 2, 1998, provided for a sliding scale annual fee to be paid to MCB by WCRS, initially equal to the practice's 1997 "overhead expenses". The Agreement defined overhead expenses as "all expenses of GMCP other than physician compensation". The Agreement also stated that if MCB reduced GMCP's overhead expense in 1998 (as compared to 1997), that MCB would return 50% of this reduction to GMCP. Similarly, the Agreement was to return 60% of any overhead reductions in 1999 and 80% of any overhead reductions in 2000 to GMCP.

On or about November 1, 1999, a new Management Agreement between MCB and GMCP was executed. The Agreement defined overhead expenses as "all expenses of GMCP other than physician compensation, physician fringe

Page 1

benefits- includes healthcare, pension, etc., - donations, travel and entertainment, legal and accounting expenses, personal supplies, interest, depreciation and capital equipment". A schedule enumerating the categories of expenses to be included in overhead was attached as an exhibit to the Agreement. After the execution of the November 1, 1999 contract, replacement financing on the $500,000 line of credit was obtained.

On or about August 28, 2001, WRCS terminated its Management Agreement with MCB. MCB and PSS have filed suit demanding a judgment against WRCS. The initial amounts of their claims were $8,208,000.00 and $1,900,000.00 respectively. Subsequently, MCB reduced its claim to $2,708,022.55 and PSS reduced its claim to $1,218,318. In response to MCB's complaint, WRCS has filed a Counterclaim.

## II.   ROLE IN THE ENGAGEMENT

I have been hired to inspect various financial records relating to the operations of MCB. My inspection includes, but is not limited to, identification of amounts applied by MCB to WRCS's overhead expenses, analysis of MCB's profits derived from its Agreements with WRCS, and determination of the appropriateness of such amounts asserted by MCB to be WRCS overhead expenses. In this regard, I have been asked to determine the amount of WCRS payments made to MCB in excess of its actual overhead expenses and how MCB used these excess payments.

## III.   ADDITIONAL INFORMATION

My analysis of data is ongoing. In addition, new information may become available before the commencement of litigation. In particular, counsel for WRCS has requested that MCB provide a computerized back-up copy of its general ledger data covering the periods during which the Agreements existed. As of the date of this report, this additional information has not been provided. I reserve the right to supplement my report due to the presentation of new information and further analysis of currently available information.

## IV. OPINIONS

I have inspected various financial records relating to the operations of MCB (the "MCB Financial Records"). These records were provided to WRCS pursuant to document production requests. As part of my inspection of the MCB Financial Records, I reviewed MCB's internally prepared Profit & Loss Budget vs. Actual Statement, January through December 2000. This document was identified as Exhibit 5 in the deposition of Kathy Sanzone (Exhibit A to this report). This document identifies MCB's gross income from the WRCS contract during 2000 as $2,625,345. This amount is referenced as "Income-GMCPA". As previously mentioned, WRCS was formerly known as Drs. Garcia, Mispireta, Pfister and Associates, PC ("GMCP" or "GMCPA"). Although the Profit & Loss Budget vs. Actual report noted the amount of income received by MCB on its contract with WRCS, the statement did not include detailed information regarding the amounts of individual expenses incurred. This additional detail was provided by contract specific Profit and Loss Statements located among the MCB Financial Records.

It is my understanding that the operations of WRCS were divided into three job categories based on the company's hospital affiliations as follows:

| Exhibit # | Hospital Name | Gross Income To MCB | Abbreviation | Name per MCB Profit & Loss by Job Statement |
|---|---|---|---|---|
| B-1 | Washington Adventist Hosp | $13,911 | WAH | WAH |
| B-2 | Washington Hosp Ctr | $2,170,936 | WHC | WHC |
| B-3 | University of MD Hosp | $440,497 | UMH | Allocate & UMH |
|  | Total WRCS/GMCPA Gross Income per Exhibits B-1 through B-3) | $2,625,345 |  |  |
|  | TOTAL WCRS (GMCPA) Income (per Exhibit A) | $2,625,345 |  |  |
|  | Variance | ($0) |  |  |

Page 3

The above analysis shows that MCB's total gross income from GMCPA in Exhibit A reconciles to the sum of the gross income totals for each of the job specific profit and loss statements. Further inspection of the internal MCB's Profit and Loss By Job Statements for 2000 show that WRCS's expenses and MCB's net income (loss) from these three jobs aggregated $1,702,928 and $922,586, respectively determined as follows:

| Description | Exhibit (Exhibit Cross Reference) | Total Expense | MCB Net Income (Loss) |
|---|---|---|---|
| WAH Expenses | B-1 (Zorn Deposition Exh. 21) | $163,131 | ($149,219) |
| WHC Expenses | B-2 (Zorn Deposition Exh. 20) | $1,217,023 | $954,081 |
| Allocate & UMH Expenses | B-3 | $322,774 | $117,724 |
|  |  | $1,702,928 | $922,586 |

In contrast, MCB's "GCPA Account Budget for 2000", a document asserted by Mr. Charles Zorn in his Deposition as having been provided to WRCS in February 2000[1] (Exhibit C), proposes that WRCS's budgeted expenses for 2000 were expected to be $2,592,118, or $889,190 more than the actual amount noted above in Exhibits B-1 through B-3. The aforementioned budget asserts that MCB expected to generate a $47,882 profit from the WRCS contract in 2000.

In addition to the documents noted above, inspection of a document entitled "Washington Regional Cardiac Surgery, Year to Date, December 2000"[2] (Exhibit D) also identifies a budgeted expense amount of $2,592,118, the same amount referenced above in Exhibit C, although some of the specific line items in the budget are different. Further analysis of MCB's Profit and Loss by Job statements (Exhibits B-1 through B-3) shows that a $922,586 profit was recorded on the internal year-end 2000 financial statement prepared by MCB on January 11, 2001, while a ($33,487) net loss (Exhibit D) was recorded on the financial

---

[1] Zorn Deposition- Exhibit No. 10.
[2] Zorn Deposition- Exhibit No. 7

statements prepared by MCB on January 22, 2001 and provided to WRCS. I have analyzed this variance between MCB's internal documents and documents provided to WRCS totaling $956,073. Although a significant variance exists between the net income figures associated with these 2 documents, analysis of the gross income figures produced a minimal variance as follows:

|  | Gross Income |
|---|---|
| Exhibits B-1 through B-3 | $2,625,344 |
| Exhibit D | $2,628,414 |
| Variance | $3,070 |

Based upon these findings, it is my opinion that the variance between the financial data contained in these documents is an expense rather than an income variance and relates substantially to an inconsistency of reporting between MCB's internal expense records and those provided to WRCS.

Further inspection and analysis of the aforementioned MCB financial records reveal that large portions of MCB's own expenses were being booked through an account entitled on the financial documents provided to WRCS (Exhibit C) "Salaries-Other" and charged to WRCS. This document does not indicate that the "Salaries-Other" expense item includes substantial expenses of MCB (and not WRCS). The disparity between these 2 documents primarily lies in the "Salaries-Other" expense account. As Exhibit E shows, $754,422 of the $956,073 variance (79%) is within the account labeled "Salaries-Other".

As previously noted, I have requested access to additional MCB documents including MCB's Profit and Loss by Job statements similar to Exhibit B-1 through B-3 but for the period of WRCS' contract with MCB both subsequent to December, 2000 and prior to January 2000. These have not been provided. In the absence of such documents I have estimated the amounts that MCB received from WRCS in excess of WRCS' overhead expenses. In making this estimate I have assumed no substantial change in MCB's revenue and expenses from the period January through December 2000. Accordingly, I have estimated MCB's receipts from WRCS in excess of WRCS' overhead during the

Page 5

period of January 1, 2001 through the termination of the contract in August 2001 and for the two months prior to January 2000. This estimate for January 2001 through August 2001 is 2/3 of the amount documented in 2000 or $615,057. The estimate for November and December 1999 is 1/6 of the amount documented in 2000 or $153,764. The total of MCB's receipts from WRCS in excess of WRCS' overhead expenses for 1999, 2000 and 2001 are as follows:

| | |
|---|---|
| 2000 MCB revenues from WRCS in excess of WRCS' expenses | $922,586 |
| 1999 MCB revenues from WRCS in excess of WRCS expenses (estimated) | $153,764 |
| 2001 MCB revenues in excess of WRCS expenses (estimated) | $615,057 |
| Total revenues in excess of expenses | $1,691,407 |

It is my understanding that in mid-to late 2000, WRCS sought more specific information concerning the allocation of the monthly payment from WRCS to MCB and the nature of the expenses for which those payments were made. It is my understanding that MCB prepared a "Monthly Financial Review" that was provided to WRCS. I have reviewed these documents including those relating to the months of December 2000[3] (Exhibit F) and January 2001[4] (Exhibit G). Despite WRCS' requests for additional information and the availability of the requested information within MCB's internal accounting records, the information provided to WRCS in the form of the Monthly Financial Review was misleading in that it lacked substantial detail, particularly with respect to certain expense items, and withheld the fact that the payments by WRCS were substantially greater than WRCS' overhead expenses. By withholding this information, MCB continued to conceal the true nature and extent of WRCS' true overhead expenses. MCB's overhead expenses that were being charged to WRCS, and

---

[3] The December 2000 Financial Review Report is also included in the Deposition of Richard A. Barsky, CPA Deposition Exhibit No. 12) and the Deposition of Kathy Sanzone (Deposition Exhibit No. 13)
[4] The January 2001 Financial Review Report is also included in the Deposition of Charles A. Zorn III (Deposition Exhibit No. 9)

Page 6

made it difficult for the reviewer of the document to understand that WRCS' payments to MCB vastly exceeded WRCS' overhead expenses.

In my opinion, the financial documents provided to WRCS were misleading in that they inappropriately recorded and distorted expense items (including the line "Salaries-Other") to make them appear as expenses of WRCS when they were not. Moreover, the financial documents provided to WRCS were misleading in that they vastly understated MCB's profits on the WRCS account in light of MCB's own internal accounting documents showing that MCB profited substantially from the WRCS contract. In my opinion, the financial documents provided to WRCS by MCB made it difficult to determine that certain items of expense actually did not represent expense items of WRCS. In my opinion, these financial documents falsely represented that portions of WRCS's payments to MCB were used to pay expenses of WRCS when in fact they were not.

## V. QUALIFICATIONS OF EXPERT

A copy of my resume accompanies this report as Exhibit H

## VI. COMPENSATION TO BE PAID FOR CONSULTATION AND TESTIMONY BY THE WITNESS

Maryland First Financial Services Corp. ("Maryland First") has been retained by WRCS for the purpose of undertaking the analysis the results of which are contained in this report. As president of Maryland First, I have personally performed and supervised the work of subordinates who have assisted in the completion of the work embodied in this report. Maryland First is compensated for these efforts based upon hourly rates for the work performed. These rates range from $250 per hour to $75 per hour. No portion of our compensation for the work performed is contingent upon the outcome of the underlying controversy.

Page 7

Page 8

## VII. OTHER CASES IN WHICH WITNESS HAS TESTIFIED AT TRIAL

A listing of other cases in which I have provided testimony accompanies my resume.

_____
Raymond J. Peroutka, Jr.